**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RONALD KITCHEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Former Chicago Police Lieutenant JON BURGE; | ) |
| RICHARD M. DALEY, Mayor of the City of Chicago | ) |
| and former State's Attorney of Cook County; TERRY | ) |
| HILLARD, former Superintendent of the Chicago | ) |
| Police Department; LEROY MARTIN, former | ) |
| Superintendent of the Chicago Police Department; | ) |
| GAYLE SHINES, former Director of the Chicago | ) |
| Police Office of Professional Standards; former | ) **JURY DEMANDED** |
| Chicago Police Sergeant JOHN BYRNE; former | ) |
| Chicago Police Detectives MICHAEL KILL, | ) |
| THOMAS BYRON, and JOHN SMITH; former | ) |
| Cook County Assistant State's Attorneys MARK | ) |
| LUKANICH and JOHN EANNACE; THOMAS | ) |
| NEEDHAM, former aide to Chicago Police | ) |
| Superintendent; CITY OF CHICAGO; COUNTY OF | ) |
| COOK, ILLINOIS; and the OFFICE OF THE COOK | ) |
| COUNTY STATE'S ATTORNEY, | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT**

Plaintiff RONALD KITCHEN, for his complaint against former Chicago Police

Lieutenant JON BURGE; RICHARD M. DALEY, Mayor of the City of Chicago and former

State's Attorney of Cook County;  TERRY HILLARD, former Superintendent of the Chicago

Police Department;  LEROY MARTIN, former Superintendent of the Chicago Police

Department; GAYLE SHINES, former Director of the Chicago Police Office of Professional

Standards; former Chicago Police Sergeant JOHN BYRNE; former Chicago Police Detectives

MICHAEL KILL, THOMAS BYRON and JOHN SMITH; former Cook County Assistant

1

State's Attorneys MARK LUKANICH and JOHN EANNACE; THOMAS NEEDHAM, former aide to the Chicago Police Superintendent; CITY OF CHICAGO; COUNTY OF COOK, ILLINOIS; and the OFFICE OF THE COOK COUNTY STATE'S ATTORNEY, alleges as follows:

## INTRODUCTION

1.      Plaintiff Ronald Kitchen spent more than 21 years in prison—13 of those years under sentence of death—because he was wrongfully charged with a sensational quintuple murder that he did not commit.  Plaintiff was charged with that crime after disgraced former Chicago Police Commander Jon Burge, along with three detectives working under Burge's command (and under the supervision of Burge's self-admitted right hand man, former Police Sergeant John Byrne), and two Assistant State's Attorneys fabricated phony evidence against Plaintiff and his co-defendant, Marvin Reeves, and after Burge and his men sadistically tortured Plaintiff into making a false confession, implicating Reeves and himself in the crime.

2.      The miscarriage of justice in Plaintiff's case was not an isolated occurrence. Rather, it was part of a pattern of systemic torture and physical abuse of African American suspects at the Area 2 and Area 3 police headquarters.  Plaintiff's torture, wrongful prosecution and false imprisonment occurred and continued because command personnel in the Chicago Police Department; successive Superintendents of Police; several Mayors of the City of Chicago, including Richard M. Daley, the current Mayor; Cook County and its State's Attorneys' Office concealed and suppressed their knowledge of ongoing torture and physical abuse under Burge, blocked and undercut efforts within the Chicago Police Department to expose and discipline offending officers, and refused to intervene to stop the continuing egregious and criminally unconstitutional misconduct.

3. Plaintiff seeks damages for the massive injuries inflicted upon him from the persons responsible for this miscarriage of justice.

## JURISDICTION AND VENUE

4. This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 and the Constitution of the United States. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). There is jurisdiction over Plaintiff's state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

5. Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## PARTIES

6. Plaintiff Ronald Kitchen is an African-American man, and a citizen of the United States.

7. Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and was, from 1982 to 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin and held this assignment until 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson. Defendant Burge engaged in a racially motivated pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors under his command, including, but not limited to, the Police Officer Defendants named herein.

8.     Defendant John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to 1986.  From 1988 to 1991, Byrne was a sergeant in the Violent Crimes Unit of Area 3 Detective Violent Crimes Unit, and a supervisor of Defendants Kill, Smith, and Byron.  Defendant Byrne, like Defendant Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including the Police Officer Defendants named herein.

9.     Defendants Michael Kill, Thomas Byron, and John Smith (referred to herein collectively, with Defendants Burge and Byrne, as "the Police Officer Defendants") were duly appointed and sworn Chicago Police detectives who were assigned to the Detective Division at Area 3 Violent Crimes Unit under Defendant Burge's command.  They engaged in a pattern and practice of torture and brutality.

10.    From 1987 to 1992, Defendant Leroy Martin was the Superintendent of Police for the City of Chicago, and was responsible for the policies, practices, and customs complained of herein.  In 1983, he was Commander of the Area 2 Detective Division and was Defendant Burge's direct supervisor, as well as the command supervisor of Defendant Byrne.

11.    From 1998 to 2004, Defendant Terry Hillard was the Superintendent of Police for the City of Chicago, and was responsible for the policies, practices, and customs complained of herein.

12.    From 1998 to 2002, Defendant Thomas Needham was counsel and administrative assistant to Superintendent Terry Hillard, who was his direct supervisor.

13.    From 1981 to 1989 Defendant Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of

4

that office. From 1989 to the present, Defendant Daley has been the Mayor of the City of Chicago and is the chief policymaker for the City of Chicago, its Police Department, City Council, and Police Board and was and is therefore responsible for the policies, practices, and customs complained of herein.

14.     From 1990 to 1998, Defendant Gayle Shines was the Director of the Office of Professional Standards ("OPS") of the Chicago Police Department.  Her direct supervisor was the Chicago Police Superintendent.  She was appointed by Defendant Daley.

15.     Defendant City of Chicago is an Illinois municipal corporation.  The City of Chicago is or was the employer of each of the Defendant Officers and Police and other city governmental officials

16.     Defendants Mark Lukanich and John Eannace were Assistant Cook County State's Attorneys. Lukanich was assigned to the Felony Review Unit and Eannace was assigned to the Criminal Trial Division.

17.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (hereinafter referred to as the "SAO") and the Cook County Board.   At certain times relevant to this action, Cook County and the Cook County State's Attorney's Office were the employers of Defendants Daley, Lukanich and Eannace, and are necessary parties to this lawsuit.

18.     At all times relevant to this action, each of the named individual defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois.  Each Defendant's actions constituted "state action" as defined under federal law.  Each defendant is sued in his or her individual capacity.

## FACTUAL ALLEGATIONS

### Plaintiff Kitchen's Arrest, Interrogation, Torture, and Wrongful Conviction

### A.      The July 26, 1988 Quintuple Murder.

19.      On July 26, 1988, two women and three children, Rose Marie Rodriguez, Daniel Rodriguez, Deborah Sepulveda, Peter Sepulveda and Rebecca Sepulveda, were murdered in a bungalow located at 6028 South Campbell Avenue in Chicago, and the house was set on fire. This mass murder (hereinafter, the "Rodriguez/Sepulveda murders") was intensively covered in the Chicago media and the police were under enormous pressure to swiftly solve the crime. Defendant Jon Burge, who was then the Commander of Area 3 Violent Crimes, reported to the scene of the crime and personally took charge of the investigation.

20.      No physical evidence at the crime scene revealed the identity of the murderer. Circumstantial evidence pointed to the possibility that the victims had been murdered by a family member.   The husband, brother-in-law and lover of victim Deborah Sepulveda *all* failed polygraph examinations administered by Chicago Police investigators.  Ms. Sepulveda's husband and her brother-in-law both provided alibis to the investigators that were proved false, and an eyewitness placed Ms. Sepulveda's brother-in-law, Arturo Sepulveda, at the scene on the night of the murders.

21.      Plaintiff was and is completely innocent of these murders.  He had no connection whatsoever to this crime and no knowledge of how it was committed or by whom.

**B.      Willie Williams' False Evidence.**

22.      At the time of the murders, an acquaintance of Plaintiff named Willie Williams was serving a three-year sentence for burglary in the Vandalia Penitentiary.  Williams, who has a long criminal history, has been charged with and convicted of multiple crimes including burglary, theft, domestic battery, drug possession, and theft of services, and, at the time of the Rodriguez/Sepulveda murders, had an anticipated release date of December 9, 1989.

23.       On August 1 or 2, 1988, Williams became aware of the five homicides and many important details of the crime by reading the Chicago newspapers.  He also learned there was an offer to pay a $2,000 reward for information regarding the case.

24.      On August 5, 1988, Williams allegedly placed a telephone call from prison to Defendant John Smith, then a detective at Area 3.  Detective Smith was one of the officers who had arrested Williams in 1985 after Williams' girlfriend reported that he had hit her in the head with a hammer.

25.      Defendant Smith later claimed that during this call Williams told Smith that Plaintiff admitted over the phone several days earlier to Williams that he and another man, Marvin Reeves, had committed the murders.

26.      Williams' claim that Plaintiff confessed to the murders to him was completely incredible.  Based on information readily available to them at the time, Defendants Smith, Burge, Byron, and Lukanich knew or should have known that Williams fabricated Plaintiff's admission using publicly available accounts of the crime and that Williams' motive was to curry favor, obtain reward money, and gain leniency in his own case.

7

27.     Rather than rejecting Williams' obviously false story, Defendants Burge, Smith, Byron, and Lukanich focused on Plaintiff and Reeves, despite the evidence pointing to other suspects, as set forth in paragraph 20 above.

28.     On August 11, 1988, Defendant Lukanich obtained a court order remanding Williams from the custody of the Illinois Department of Corrections to the custody of the SAO, where Williams was housed in the Witness Quarters at the Cook County Jail.

29.     On August 12, 1988, Defendants Smith and Lukanich prepared and filed an application with the Circuit Court of Cook County, relying on Williams' false statements, and obtained an order for Williams to conduct "consensual overhears" of Plaintiff and Reeves.

30.     Pursuant to this fraudulently-obtained order, between August 12 and August 22, 1988, Williams made 36 phone calls to Plaintiff and Reeves, all of which were overheard by the Defendants, including Smith and Lukanich.  During this ten-day period, Williams failed to elicit any incriminating information regarding the murders from either Plaintiff or Reeves.

31.     From August 12, 1988 to August 25, 1988, Defendants Smith, Lukanich, and Byron and unsued co-conspirator ASA William Merritt repeatedly met with Williams, further shaping and manufacturing his knowingly false story concerning Plaintiff's purported telephonic admissions.

C.      **The Interrogation and Torture of Plaintiff.**

32.     Despite the inherent implausibility of Williams' story and their inability to obtain any corroboration for Williams' claims, Defendants Burge, Kill, Byron, Smith and Lukanich decided to arrest Plaintiff in order to subject him to physical abuse and thereby coerce him into confessing to the murders.

33.     On the evening of August 25, 1988, between 9:30 p.m. and 10:00 p.m., Defendant Byron and Chicago police Officer Dowling arrested Plaintiff, purportedly for auto theft.   In furtherance of the plan to systematically abuse and torture Plaintiff until he confessed to the Rodriguez/Sepulveda murders, Defendant Byron falsely told Plaintiff's mother and friends that Plaintiff would probably be released in a few hours on a recognizance bond.

34.     Defendant Byron drove Plaintiff to 39th and California, the location of Area 3.  At Area 3, over the course of more than sixteen hours Plaintiff was deprived of food and sleep; was subjected to repeated acts of extreme physical abuse; was taunted and subjected to racial epithets; was refused permission to speak with an attorney; and, thereby, was coerced into signing a statement prepared by Defendant Lukanich that implicated himself and Marvin Reeves in the Rodriguez/Sepulveda murders.  The abuse of Plaintiff included but was not limited to the actions set forth in paragraphs 35 through 42 below.

35.     While Plaintiff was handcuffed to a metal loop on the wall of an interrogation room at Area 3, shortly following his arrival, Defendants Burge and Kill beat Plaintiff extensively, striking him in the face, back, chest and groin with fists and kicking him in the back, ribs and groin—following Plaintiff's failure to answer their question of who Plaintiff had been "speaking to" regarding the murders.

36.     Defendant Byron responded to Plaintiff's request to telephone a lawyer by taking an unattached telephone receiver, hitting Plaintiff on the side of the head with the receiver, and then handing it to Plaintiff and leaving the room.

37.     Defendants Burge and Kill subjected Plaintiff to a second session of physical abuse, including punching and kicking Plaintiff; kicking Plaintiff out of the chair in which he was seated; and punching and kicking Plaintiff in the ribs and groin as he lay on the floor—

following Plaintiff refusal to admit that he had "talked to anybody" about the Rodriguez/Sepulveda murders or been involved in any way.

38.     Defendant Smith asked Plaintiff if he had "ever been introduced to the telephone book and the blackjack;" forced Plaintiff up against a wall; and used a blackjack to violently assault Plaintiff in the genitals and a telephone book to abuse Plaintiff on his head, causing Plaintiff to suffer excruciating pain and to cry out in agony.

39.     Defendant Kill told Plaintiff that the detectives would "keep going until we get tired;" and repeatedly beat Plaintiff when Plaintiff initially refused to speak with ASA Lukanich until Plaintiff had had the opportunity to speak with his lawyer.

40.     On two separate occasions, Defendant Lukanich entered the interrogation room and asked Plaintiff if he was willing to speak with him.  On each occasion, Plaintiff requested to speak with a lawyer; Lukanich left the room; and Kill promptly re-entered the room and resumed beating and verbally abusing Plaintiff.

41.     Throughout the interrogation process, the police officer defendants subjected Plaintiff to racial epithets.

42.     After enduring over sixteen hours of torture and abuse, because he was tired, scared, and could not endure more torturous beatings, Plaintiff told defendant Kill that he would make a statement.  After Plaintiff's "agreement" had thus been secured, in the early afternoon of August 26, Defendant Lukanich entered the interrogation room in the company of Defendant Kill.  At this point, Plaintiff had been at Area 3 for over sixteen hours, had not been able to sleep or been given food and had been tortured extensively, as described in the preceding paragraphs.

43.     Defendant Lukanich wrote out a statement to be signed by Plaintiff as Defendant Kill asked leading questions of Plaintiff.   Kill provided the story of Plaintiff's purported

involvement in the murders, piece by piece; Lukanich asked Plaintiff if Kill's account was correct; Plaintiff responded "yes;" and Lukanich then recorded Kill's statement.  This pattern continued until Lukanich had written a complete statement, which Plaintiff signed involuntarily, under duress and in order to end the torture and brutality.

44.     In this false and coerced statement, Plaintiff placed himself at the scene of the crime, implicated Marvin Reeves, but did not admit any participation in the crime itself.

45.     After he provided the false and coerced statement to Kill and Lukanich, Plaintiff was transported from Area 3 Police Headquarters to several other Chicago Police stations before he was ultimately brought to Cook County Jail on August 27, 1988.

46.     While being processed at Cook County Jail, Plaintiff requested medical attention which was denied to him.  Instead he was placed in the "hole" of the jail.

47.     On August 28, 1988, Plaintiff appeared at his first court date, a bond hearing before Judge Richard Fitzgerald.  Defense counsel for Plaintiff and Reeves advised the Judge in open court that both complained they were beaten by Chicago Police officers while in their custody. Defense counsel asserted that Plaintiff had suffered injuries to his groin, head, and back. Judge Fitzgerald noted Plaintiff was physically injured and ordered that he be transported to Cook County for medical attention.

48.     That same evening, Plaintiff was transferred to the Cermak Hospital division of Cook County Jail.  Plaintiff informed the doctors he was abused by the Chicago Police.  Plaintiff was diagnosed as suffering from testicular trauma.  He was treated with pain killers and given a scrotal support.  He continued to receive medical treatment for this condition over the next four months.

**D.    Plaintiff's Wrongful Conviction.**

49.    Defendant Lukanich and the Police Officer Defendants memorialized Plaintiff's coerced confession in official reports that omitted any mention of the fact that the confession was the product of the abuse described in the preceding section of this Complaint.   These false official reports were presented to the attorneys who prosecuted Plaintiff and were relied upon in order to secure Plaintiff's wrongful conviction.

50.    Knowing that they did not have sufficient credible proof to sustain their case, the police officer Defendants, together with Defendants Lukanich and Eannace, and other unsued co-conspirators, including but not limited to Assistant State's Attorney William Merritt, continued their "investigation" by further shaping Williams' story, by making promises and extending favors that included giving his girlfriend rent money and obtaining his early release from prison.

51.    Defendants Kill, Byron, Smith and Lukanich were called as witnesses at the hearing in the Circuit Court of Cook County on Plaintiff's motion to suppress his coerced confession and at Plaintiff's trial for multiple charges of murder.   In their testimony, these defendants perjuriously testified that Plaintiff had voluntarily admitted to the murders, denied that they had tortured and abused him, and suppressed Defendant Burge's role in the torture.

52.    Thus, by their false reports and their perjured testimony, the Police Officer Defendants and Defendant Lukanich suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and who defended against and heard Plaintiff's post conviction petitions, inter alia, that the admissions they attributed to Plaintiff were: (a) false and totally unreliable; (b) coerced through torture; (c) constructed and manufactured by them; and (d)

the product of a pattern and practice of torture and abuse that that is fully described in paragraphs 60 to 82 below.

53. Additionally, Defendants Burge, Smith, Byron, Kill and Lukanich and unsued co-conspirator Merritt suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and who defended against and heard Plaintiff's post conviction petitions their roles in manufacturing the incredible and false statements and subsequent testimony of jailhouse informant Williams. Among other things, these defendants concealed the fact that Williams' recorded conversations with Plaintiff and Reeves between August 12 and August 22 failed to yield any incriminating statements from either.

54. At all stages of Plaintiff's criminal case, Defendant Eannace suppressed from Plaintiff's defense lawyers, from the judges and juries who heard Plaintiff's case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and who defended against and heard Plaintiff's post conviction petitions, all evidence, including explicit documentation, which showed that he and his fellow defendants and co-conspirators had made promises and obtained favors, including but not limited to, early release and rent money, for jailhouse informant Williams.

55. In active furtherance of this suppression of evidence, Defendant Eannace did not direct Williams to tell the truth when Williams, in his presence at a pre-trial interview conducted by Plaintiff's counsel in January of 1989, falsely denied that he had received favors, nor did Eannace affirmatively inform defense counsel of these favors then or at any other time.

56. In additional active furtherance of this suppression of evidence, in a 2003 meeting with the prosecutors who were representing the State in Plaintiff's post conviction proceedings,

13

and again in a 2006 interview with Plaintiff's post conviction counsel, Defendant Eannace falsely stated that he did not suppress documentary evidence of favors which Williams obtained, and further falsely asserted that he had had orally informed Plaintiff's defense counsel, prior to trial, of the favors.

57.     The Police Officer Defendants and Defendants Lukanich and Eannace also suppressed and concealed key elements of the evidence that was exculpatory to the Plaintiff, set forth in paragraph 20 above, that there were grounds to suspect Deborah Sepulveda's husband, brother-in-law and lover of the murders.

58.     Prior to Plaintiff's criminal trial in 1990, the trial judge, relying on the Police Officer Defendants' false and perjured testimony denying torture, and without the exculpatory evidence that Plaintiff (and many others) had been tortured by these Police Officer Defendants, denied Plaintiff's motion to suppress his coerced and fabricated statement.  Plaintiff's statement was presented by the prosecution, together with Willie Williams' evidence regarding Plaintiff's alleged admissions to him, as the only evidence against Plaintiff at his trial.  This evidence provided the sole basis for Plaintiff's conviction for murder.  Absent the Defendants' coercion, torture, fabrication, and suppression and destruction of evidence, and failure to investigate, Plaintiff would neither have been prosecuted for, nor convicted of, multiple murders that he did not commit.

59.     After his trial and conviction, Plaintiff was sentenced to death for the murders of two women and three children.  Plaintiff was widely vilified and reviled as a mass murderer, when in fact he was completely innocent.

### The Conspiracy to Torture and Abuse Suspects at Area 2 and Area 3
### Police Headquarters and to Conceal and Cover Up the Torture and Abuse

60.     Plaintiff's torture and abuse was not an isolated incident of individual police officer brutality and misconduct.  Rather, the interrogation and torture of Plaintiff in pursuit of a confession which was constructed by the Police Officer Defendants and fed to him after he was broken, was part of a long-standing pattern and practice of similar acts of racially motivated torture, including electric shock, mock executions and Russian roulette, suspensions, telephone bookings, baggings, and beatings committed against African American men under the supervision, and with the encouragement, participation and ratification of Defendants Burge and Byrne.  Burge and Byrne supervised, encouraged, participated in, failed to prevent, and ratified the abuse of Plaintiff by the other Police Officer Defendants, as alleged above, as part of this pattern and practice.

61.     The earliest known torture in this pattern occurred on or about May 29, 1973, when Defendant Burge, then a detective on the Area 2 midnight shift, tortured African American suspect Anthony Holmes, using an electric shock box, suffocation with a bag, beating and racial epithets.

62.     The Chicago Police Department took no action to punish or restrain defendant Burge at that time.  Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, George Powell, Tony Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

63.     In February 1982, the Superintendent of the Chicago Police Department, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers.  In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African American citizens, including

Donald White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and abused and terrorized a large number of other African American citizens.

64.      On February 14, 1982, Defendant Burge and numerous Area 2 detectives arrested Andrew Wilson for the police officer murders.  Throughout that day, Burge and other Area 2 detectives tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears and other parts of the body with a black box and a second plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating.  As fully set forth in paragraphs 67 and 68, below, Defendant States Attorney Daley, the then-Mayor of the City of Chicago, and the then-Superintendent of the Chicago Police Department all closely monitored developments in the manhunt.  All three learned from numerous sources of the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

65.      As a direct and proximate result of the failure of Defendant Daley and Defendant Leroy Martin (who became Superintendent of the Chicago Police Department in 1987) to intervene, to discipline and to supervise, Defendants Burge, Byrne and other Area 2 Detectives tortured numerous additional African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of 1982 to August of 1988.  The victims in this period included the following African American men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip

Adkins, Robert Billingsley, Stanley Howard, Alphonso Pinex, Thomas Craft, Lavert Jones, Lonza Holmes, Aaron Patterson, Madison Hobley, Michael Tillman, and Stephen Bell.

66.     In addition to their suppression of other evidence as described above in paragraphs 52 through 57, Defendant Lukanich and the Police Officer Defendants also suppressed from Plaintiff and his counsel; the trial, appellate and post-conviction prosecutors; and the jurors and judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men.   These defendants also suppressed the physical implements of the pattern and practice of torture, including the telephone book and blackjack used against Plaintiff and the cattle prods, electric shock box, plastic bags, typewriter covers, blackjacks, telephone books, shotguns, and handguns used by them and other Area 2 detectives against numerous other victims of their pattern and practice of torture.

**A.     Defendant Daley's Failure to Intervene and Concealment of Exculpatory Evidence is a *Proximate* Cause of Plaintiff's Coerced Confession and Wrongful Conviction.**

67.     By no later than February 1982, Defendant Daley had direct, personal knowledge that Defendant Burge and other Area 2 detectives committed acts of torture against African American suspects at Area 2.  During the February 1982 manhunt described above in paragraphs 63 and 64, Defendant Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2.  Daley therefore knew or should have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular, the abuse of Donald White, who was placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Burge and his men perpetrated against him.

68.     Defendant Daley was also informed of the arrest of Andrew Wilson on the morning of February 14, 1982.  Throughout the day of February 14, as Wilson was tortured (frequently screaming in the course of the abuse), several high ranking Assistant State's Attorneys were present at Area 2.  An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, ASA Larry Hyman, participated directly in the interrogation of Wilson, which occurred between sessions of torture at the hands of Burge and his men.  Wilson explicitly informed Hyman that Burge and his men were torturing him.  The high ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that Wilson was being tortured.  Those high ranking assistants were reporting directly to Defendant Daley and to the First Assistant State's Attorney at the time, Richard Devine.  Neither Daley nor any of his top assistants did anything to halt or prevent the torture of Wilson.

69.     On or about February 17, 1982, Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that medical examination of Andrew Wilson revealed unmistakable signs that Wilson had been abused while in police custody and demanding an investigation.  After conferring with high ranking police command personnel (and chastising those present at Area 2 for allowing Wilson's torture to happen), the Superintendent wrote a letter to Defendant Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of Wilson, the Superintendent would not investigate or otherwise pursue the matter without instructions from Daley.

70.     Defendant Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant and other high level subordinates.  He never responded to the letter.

18

71.     Daley and his subordinates were fully aware that Superintendent Brzeczek's letter set forth criminal conduct by Burge and other Chicago police detectives and officers, and they knew or should have known that ASA Larry Hyman was complicit in this criminal conduct. They also knew that there was physical, medical, and testimonial evidence which supported the claim of physical abuse.  Not only did Defendant Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation.  Instead, on information and belief, Daley communicated to Dr. Raba, through unsued co-conspirator and County Board President George Dunne, that Raba " should not get involved"  in the Wilson case, and subsequently, together with the Superintendent of Police, issued public commendations to Burge and his men.

72.     As a direct result of Defendant Daley's refusal to act, the Chicago Police Department, and its Office of Professional Standards indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Wilson and Raba, and by the other African-American citizens who were tortured and abused during the manhunt.

73.     Throughout the manhunt, the arrest of Andrew Wilson, the receipt and discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

74.     This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Defendant Daley, no longer exists, and, on further information and belief, was destroyed by or at the direction of Defendant Daley.

19

75.     In the period of time between Wilson's torture, in February 1982, and Plaintiff's torture, in August 1988, the Cook County State's Attorney's Office, under the direction of Defendant Daley, prosecuted at least thirty African American men who were tortured by Defendant Byrne and Area 2 detectives under his command.   In none of these cases did Defendant Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Wilson and the specific knowledge of Defendant Daley and his high ranking subordinates as to the truth of Wilson's allegations.   In none of these cases, did Defendant Daley request an investigation into the allegations of torture.

76.     Defendant Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the Cook County State's Attorney's Office prosecuted in this period of time.   There is no more grave and important decision made by the State's Attorney of Cook County than the decision to seek the death penalty against an accused defendant.   Each and every such decision was made personally by the State's Attorney himself after careful review of the case and full consultation with both his high command and the line assistants handling the prosecution.

77.     Subsequent to seeking and obtaining the death penalty in the Wilson case and prior to Plaintiff's case, Defendant Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Madison Hobley, Stanley Howard, Aaron Patterson, Reginald Mahaffey and Jerry Mahaffey—all of whom claimed that they were tortured by Defendant Burge and/or detectives under Burge's command.   On information and belief, Defendant Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge and/or his men, in some cases using techniques identical to those Daley knew had been used against Andrew Wilson.   Knowing that

these individuals all credibly claimed that they had been tortured into confessing, Daley
nonetheless decided to seek the ultimate punishment against each of them, in each case declining
to pursue any investigation of the involved Area 2 detectives and deliberately failing to disclose
the exculpatory information in his personal possession and in possession of the Office of the
Cook County State's Attorney.

78.     In the same manner, Defendant Daley personally decided to seek the death
penalty against Plaintiff and, in so doing, became personally familiar with Plaintiff's case and,
specifically, on information and belief, Plaintiff's allegations of torture and physical abuse at the
hands of the Police Officer Defendants.  At the time Defendant Daley reviewed Plaintiff's case
and decided to seek the death penalty against him, Daley: (a) had near-certain personal
knowledge that Andrew Wilson had been tortured and that numerous other African Americans
had been tortured, abused, and terrorized by Burge and his men during the Wilson manhunt; (b)
had personal knowledge that Burge and his detectives were allegedly continuing to practice
extreme physical abuse and torture against African American suspects; and (c) personally knew
of exculpatory information regarding the pattern of torture, which he had deliberately suppressed
since February 1982.  Defendant Daley nonetheless decided to seek the ultimate punishment
against Plaintiff, again declining to pursue any investigation of Plaintiff's allegations and
deliberately failing to disclose the exculpatory information in his personal possession and in
possession of the Office of the Cook County State's Attorney.

79.     The actions and inactions of Defendant Daley during the period from February
1982 through August 1988 in refusing and failing to investigate the actions of Defendant Burge
and his confederates and in suppressing the exculpatory evidence in his possession proximately

21

caused Plaintiff's torture and his physical abuse, Plaintiff's wrongful conviction for crimes that he did not commit, and Plaintiff's wrongful incarceration.

> **B.      Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence is a *Proximate* Cause of Plaintiff's Coerced Confession and Wrongful Conviction.**

80.      Defendant Martin was the Commander of Area 2 in 1983 and at that time was Defendant Burge's direct supervisor.  At that time, Defendant Martin learned that Burge and detectives under his command systematically tortured and abused at least the following African American suspects: Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton. Defendant failed to initiate appropriate investigations or to discipline Burge in connection with any of these cases.

81.      In 1987, Martin was named Superintendent of the Chicago Police Department, a position that he continued to hold in August 1988, when Plaintiff was physically coerced into making a false confession.  As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 commander, Defendant Martin continued to fail to intervene, to supervise, discipline or otherwise act to prevent the ongoing misconduct of Burge and his men. Following Plaintiff's torture and wrongful conviction, Defendant Martin worked actively to conceal and suppress evidence of the pattern of torture, as is fully alleged in paragraphs 89 through 95 below.

82.     The actions and inactions of Defendant Martin during the period from 1983 through August 1988, in refusing and failing to investigate the actions of Defendant Burge and his confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's torture and his physical abuse, Plaintiff's wrongful conviction for crimes that he did not commit and Plaintiff's wrongful incarceration.

C.     **The Actions and Inactions of Defendants Daley, Martin, Hillard, Needham and Shines to Conceal and Cover Up the Pattern of Torture under Burge Frustrated Plaintiff's Efforts to Exonerate Himself and Prolonged Plaintiff's Unjust Incarceration.**

83.     Following his conviction and death sentence in 1990, Plaintiff languished in prison until July 7, 2009, when the Illinois Attorney General finally agreed to dismiss all charges against Plaintiff and he received his certificate of innocence from the Circuit Court of Cook County on August 19, 2009.

84.     Plaintiff's wrongful prosecution was continued, his exoneration was delayed and his imprisonment lasted far longer than it otherwise would have because, for many years, Defendants Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including the Police Officer Defendants, their confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal, and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

85.     In 1989, Defendant Daley became the Mayor of the City of Chicago.  In that capacity, Defendant Daley was directly responsible for the appointment of the Superintendent of the Chicago Police Department.  Defendant Daley also had ultimate responsibility for the operations of the Police.  Daley therefore had the duty to take all necessary steps to ensure the Department and its officers disclosed exculpatory information to victims of Defendant Burge and

23

his men, including Plaintiff.   In addition, Defendant Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Defendant Daley had become personally aware while he was State's Attorney of Cook County.

86.     Defendant Daley did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County until July 7, 2009, when Plaintiff was finally exonerated and released from prison.  Nor did Defendant Daley intervene at any time to direct the Chicago Police Department to disclose material exculpatory information in its possession regarding Burge or to conduct a thorough and appropriately aggressive investigation of Burge and the detectives who allegedly abused African American men while working under Burge's command and to follow through on the results of such an investigation.

87.     Rather than disclose exculpatory material and conduct appropriate investigations, Defendants Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge.  Their actions in this regard included, but are not limited to those alleged in paragraphs 87 through 103, below.

88.     In 1990 a report (hereinafter, the "Goldston Report") was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systemic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it.  In 1991, the Goldston Report was supplemented with a finding that Defendants Burge and Byrne were the prime movers in this pattern of abuse and that they and two other Area 2 detectives had

tortured Andrew Wilson.  In a companion Report (the Sanders Report) the OPS found that Burge and two of his men tortured Andrew Wilson and recommended that they be fired.

89.     The Goldston Report, and the information it contained, was highly exculpatory for Plaintiff, who was wrongfully convicted of the Sepulveda murders at about the time the initial section of the Goldston Report was completed.

90.     Defendant Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

91.     Defendant Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, findings and conclusions set forth above, *inter alia*, by suppressing the findings that there was systematic abuse at Area 2, which implicated Defendants Martin, Burge, Byrne and their men.

92.     The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the release.

93.     On or before February 7, 1992, Defendant Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel.  Defendant Daley knew or should have known that Defendant Martin was the commanding officer at Area 2 and Defendant Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Defendant Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

94.     Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Defendant Daley did not seek an independent federal investigation; direct Defendant Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or seek the prosecution of Burge and his confederates.

95.     Instead, in a joint effort with Defendant Martin, Defendant Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was to undermine the credibiilty of the Goldston Report's finding that the torture at Area 2 was "systematic."

96.     Even after learning of the findings in the Goldston Report, Defendant Martin, Defendant OPS Director Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse made by electric shock victim Melvin Jones against Defendant Burge.

97.     In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson.  These findings became final in December 1995.

98.     In 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases.   After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations that Defendant Byrne, and Area 2 detectives Peter Dignan and Charles Grunhard, racially abused Darrell Cannon and tortured him with a cattle prod.  OPS supervisor Carmen Christia reviewed the findings and approved them.

99.     The OPS also entered sustained findings of torture and abuse against Byrne and Dignan in five other re-opened cases, including that of death row inmate Stanley Howard.

100.    From 1993 until 1998, Defendant Shines (who had previously been appointed by Defendant Daley) under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

101.     In 1996, Defendant Daley, despite numerous allegations and sustained findings of torture and abuse against Chicago Police Detective Peter Dignan, one of Burge's key underlings, meritoriously promoted Dignan to the police rank of lieutenant.

102.     In 1998, Defendants Hillard and Needham, with full knowledge that Defendants Burge, Byrne, and other Area 2 and Area 3 detectives participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate Defendant Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

103.     On information and belief, Defendant Daley also personally insisted, from the time he became Mayor through the date of Plaintiff's release from custody in July 2009, that the City of Chicago continue to finance the defense of Burge and Area 2 detectives who worked under Burge's command, despite his personal knowledge that Burge committed acts of torture against African American men while employed as a Chicago Police officer and condoned such acts by detectives under his command.  Daley's insistence on defending Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge, and has

27

continued to the present, despite Burge's indictment for perjury and obstruction of justice in October of 2008.

### Plaintiff's Exoneration on the Basis of Innocence

104.    The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly continued the wrongful prosecution of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

105.    Pursuant to his Second Amended Post-Conviction Petition, Plaintiff's case was subsequently vacated by the Circuit Court trial judge, he was granted a new trial, and on July 7, 2009, Plaintiff's case was *nolle prosequied* by the prosecution, and he was released from custody.

106.    On August 19, 2009, the Circuit Court of Cook County found, pursuant to 735 ILCS 5/2-702, that Plaintiff had established by a preponderance of the evidence that he was innocent of the charges for which he was convicted and granted him a certificate of innocence.

### The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy

107.    All of the named individual defendants, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.  By the overt acts set forth above, these defendants deprived and continue to deprive Plaintiff of those rights, including his right to be free from unreasonable arrest and seizure, wrongful confinement and imprisonment; his right to be free from involuntary self-

incrimination and from interrogation techniques that "shock the conscience;" his right to access

to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as

protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution.

## Plaintiff's Damages

108.    Plaintiff spent more than 21 years in prison, 13 on death row, for a crime he did

not commit.  This time was emotionally, physically, and psychologically grueling and Plaintiff

has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and

loneliness.   Plaintiff also suffered from the loss of sustained contact with his children, and has

been prevented from holding gainful employment or pursuing educational opportunities outside

the prison walls.   He continues to live under the effects of his isolation, incarceration, and

depression.   Additionally, Plaintiff continues to experience pain and suffering, humiliation,

constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his

torture and abuse and his years of wrongful incarceration.

## COUNT I
### (42 U.S.C. 1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Conviction)

109.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this

count.

110.    Defendants Daley, Burge, Byrne, Kill, Byron, Smith, Lukanich and Martin,

individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, conviction,

and imprisonment of Plaintiff. Additionally, these same Defendants, together with Defendants

Eannace Shines, Hillard, and Needham, individually, jointly, and in conspiracy, caused the

continuation of that wrongful conviction.

111.   These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: purchasing, coercing, constructing and/or fabricating the false and totally unreliable statements which formed the basis for Plaintiff's charging, prosecution and conviction; withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements were false, totally unreliable, constructed, purchased, and coerced; suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and evidence, including, but not limited to, the instruments of torture, as well as other exculpatory evidence; giving a false and incomplete version of events to prosecutors; writing false reports and giving false statements and testimony; improperly influencing the judges hearing Plaintiff's case, *inter alia*, by making false public statements; obstructing and improperly influencing investigations which would have led to discovery of exculpatory evidence; suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing that is set forth above in this Complaint.

112.   In engaging in the conduct described in the preceding paragraph, the Defendants named above thereby unconstitutionally deprived Plaintiff of his liberty and violated his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

113.   Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution, conviction, and resulting imprisonment despite having the opportunity and duty to do so.

114.    The actions of the Defendants named above as set forth in this Complaint were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Kill, Byron, Smith, Martin, Lukanich, Eannace, Shines, Hillard, and Needham, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 Claim for False Arrest and Imprisonment)

115.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

116.    The actions of Defendants Burge, Byrne, Byron, Kill, and Smith, individually, jointly, and in conspiracy, in falsely arresting and imprisoning Plaintiff, and of these same Defendants, together with Defendants Daley, Eannace, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, in continuing Plaintiff's imprisonment for twenty-one years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and deprived Plaintiff of liberty without due process of law.

117.    Defendants Burge, Byrne, Kill, Byron, and Lukanich, failed to prevent Plaintiff's wrongful arrest and resultant imprisonment despite having the opportunity and duty to do so, while Defendants Daley, Eannace, Martin, Hillard, Needham and Shines failed to prevent the continuation of Plaintiff's wrongful arrest and resulting imprisonment despite having the opportunity and duty to do so.

118.     The actions of the Defendants in falsely imprisoning Plaintiff, continuing his false imprisonment, covering up their own misconduct, and/or failing to prevent the unlawful arrest and imprisonment, and/or its continuation were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Kill, Byron, Smith, Martin, Lukanich, Eannace, Shines, Hillard, and Needham, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. § 1983 Claim for Torture and Physical Abuse)

119.     Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

120.     The actions of Defendants Burge, Kill, Byron, and Smith in torturing and physically abusing Plaintiff and threatening him with additional torture and physical abuse, individually, jointly and in conspiracy violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure.

121.     Defendants Burge, Byrne, Kill, Byron, Smith, and Lukanich were aware of the torture and physical abuse of the Plaintiff, and participated in it by encouraging and/or allowing the torture and abuse to continue.  These defendants had the opportunity and duty to intervene and prevent the torture and abuse of Plaintiff, *inter alia* by reporting the abuse to superiors in the Police Department and the State's Attorney's Office, and failed to do so.

122.     Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne and their co-conspirators from continuing their coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up this conduct, and by investigating, prosecuting, removing or otherwise disciplining the torturers and their supervisors when they first learned of their criminal conduct in 1982, and on numerous occasions subsequent thereto.  Thus, these defendants failed to intervene and prevent Plaintiff's torture, despite having the opportunity and duty to do so.

123.     The actions of the Defendants, individually, jointly and in conspiracy, in torturing and physically abusing Plaintiff, threatening to inflict further torture and physical abuse, and/or failing to stop or prevent Plaintiff's torture and abuse while having the opportunity and duty to do so, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, and Martin for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such - other relief as this Court deems equitable and just.

## COUNT IV
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

124.     Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

125.     The actions of Defendants Burge, Byrne, Kill, Byron, and Smith individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during Plaintiff's interrogation, resulted in false, coerced, and

fabricated admissions, and violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

126.    The actions of Defendants Burge, Byrne, Kill, Byron, and Smith in using torture and other coercive techniques to interrogate Plaintiff, and/or, together with Defendant Lukanich, in condoning and permitting the use of said techniques, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

127.    Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne and their co-conspirators from continuing their coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up this conduct, and by investigating, prosecuting, removing or otherwise disciplining the torturers and their supervisors when they first learned of their criminal conduct in 1982, and on numerous occasions subsequent thereto.  Thus, these defendants failed to intervene and prevent Plaintiff's torture, despite having the opportunity and duty to do so.

128.    The failure of Defendants Daley, Martin and their co-Defendants to intervene to stop Defendants Burge and Byrne and their co-conspirators from continuing their coercive interrogations and torture tactics proximately caused Plaintiff's coercive interrogation by torture and his resultant injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich and Martin, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT V
### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

129.     Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

130.     Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines, Needham, and Hillard, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in this Complaint.

131.     This conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African-American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy.  The Defendants named above therefore also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1985.

132.     Additionally or alternatively, Defendants Burge, Byrne, Kill, Smith, Byron, Lukanich, and Eannace, knowing that the above §1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of that conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

WHEREFORE Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines,

Needham, and Hillard,, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VI
### (42 U.S.C. § 1983 *Monell* Policy Claim against City of Chicago)

133.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

134.    The actions of Defendants Daley, Burge, Byrne, Kill, Smith, Byron, and Martin as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

135.    At all times material to this complaint, Defendant City of Chicago, by and through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or the Corporation Counsel's Office had the following interrelated *de facto* policies, practices, and customs, among others:

a)    conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3;

b)    manufacturing, fabricating, or using improper suggestive tactics to obtain false witness statements;

c)    filing false reports, and giving false statements and testimony about interrogations and confessions and fabricating or constructing parts or all of confessions; suppressing evidence concerning interrogations and confessions; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during these interrogations; denying suspects their right to full and fair access to the courts; and otherwise covering up the true nature of these interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of Defendants Burge and Byrne;

36

d)      failing to videotape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

e)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the "repeater" Defendants Burge, Byrne, Kill, and all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f)      perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne), whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or to give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges.  The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have tortured or otherwise coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3, have been employed, most recently in the Government's investigation and prosecution of Jon Burge and the investigation of men under his command; and

g)      covering up and suppressing evidence and findings, refusing to properly investigate, arrest and charge, continuing to finance Defendant Burge's defense and otherwise attempting to publicly and judicially defend his actions long after repeatedly acknowledging that he had committed repeated acts of torture, and after he had been indicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

136.    The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up

of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both before and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline. This pattern and practice was also known to former Chicago Mayor Jane Byrne and to Defendant Daley (throughout his tenure as Mayor of Chicago) and to their respective Chiefs of Staff; to successive Police Superintendents, including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Defendant Hillard, and Phil Cline; to the successive OPS Directors, including Defendant Shines; to various Chicago Police Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend; to Chiefs of Detectives, including William Hanhardt and Defendant Hillard; to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, some or all of whom participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of Plaintiff and other torture victims, and the denial of their full and fair access to the courts, *inter alia* in the manner set forth in this complaint.

137. The interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a

direct and proximate cause of the unconstitutional acts committed by the named Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

138.     The City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, Kill, Byron, Smith, Martin, Shines, Hillard, and Needham was also done with deliberate indifference and likewise was a direct and proximate cause of the injuries to Plaintiff.

139.     Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above by final Chicago governmental and police policymakers, including, but not limited to, Defendant Mayor Daley, successive Police Superintendents, including Defendants Martin and Hillard, and their direct subordinates, including, but not limited to, Defendants Shines and Needham, establish that the constitutional violations alleged in this complaint were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

### COUNT VII
### (State Law Claim for False Arrest and False Imprisonment)

140.     Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

141.     The arrest and imprisonment of Plaintiff, without probable cause, individually, jointly, and in conspiracy by Defendants Burge, Byrne, Kill, Byron, Smith,  and Lukanich, and its continuation by these Defendants, together with Defendants Daley, Eannace, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, constituted the torts of false arrest

and false imprisonment under Illinois law.

142.     Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

WHEREFORE, Plaintiff demands compensatory damages against Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines, Hillard, and Needham, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems just and equitable.

## COUNT VIII
### (State Law Claim for Malicious Prosecution)

143.     Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

144.     Defendants Burge, Byrne, Kill, Smith, Byron, and Lukanich, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Daley, Eannace, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, continued that prosecution without probable cause.

145.     The prosecution of Plaintiff was terminated in Plaintiff's favor.

146.     The Defendants' actions were done in a willful and wanton manner.

147.     The Defendants' actions directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands actual or compensatory damages against Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich,, Eannace, Martin, Shines, Hillard, and Needham, and, because these Defendants acted in a malicious, willful and/or wanton manner

toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT IX
## (State Law Claim for Intentional Infliction of Emotional Distress)

148.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

149.    Defendants Daley, Burge, Byrne, Kill, Byron, Smith, Lukanich, and Martin individually, jointly, and in conspiracy, engaged in extreme and outrageous conduct by, *inter alia*, torturing a false confession from Plaintiff and/or by failing to prevent or stop Plaintiff's torture, by constructing and fabricating the details of Plaintiff's confession, by manufacturing a witness against Plaintiff, and by procuring his prosecution, conviction, and death sentence for a murder he did not commit by means of the false confession, and fabricated evidence.

150.    The Defendants named in the preceding paragraph, together with Defendants Eannace Hillard, Shines, and Needham, individually, jointly, and in conspiracy, engaged in additional extreme and outrageous conduct by fabricating, coercing, and suppressing other evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate or discipline the torturers, and by covering up all of their individual and conspiratorial actions as more fully alleged above in this Complaint.

151.    Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines, Needham, and Hillard intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

152.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including

41

fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and inability to focus or concentrate.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines, Needham, and Hillard, for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT X
### (State Claim for Conspiracy)

153.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

154.    Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines, Needham, and Hillard, with other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison Plaintiff and/or to continue that imprisonment, to maliciously prosecute Plaintiff and/or continue that prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

155.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth above.

156.    The conspiracy or conspiracies were and are continuing in nature.

WHEREFORE Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, Burge, Byrne, Kill, Smith, Byron, Lukanich, Eannace, Martin, Shines, Needham, and Hillard, and, because these Defendants acted in a malicious, willful and/or wanton

manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

**COUNT XI**
**(State Law Respondeat Superior Claim)**

157.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

158.    Defendants Burge, Byrne, Kill, Smith, Byron, Martin, Shines, Needham, and Hillard were, at all times material to this complaint, employees of the Defendant City of Chicago; were acting within the scope of their employment; and their acts, which violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

159.    Defendant Daley, at the times specified in the complaint, was an employee of the Defendant City of Chicago; was acting at these times within the scope of his employment as a City employee; and his acts, which violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

**COUNT XII**
**(745 ILCS 10/9-102 and Common Law Claims Against the City, County and SAO)**

160.    Plaintiff re-alleges all of the preceding paragraphs and incorporates them in this count.

43

161.    Defendant City of Chicago was the employer of Defendants Burge, Byrne, Kill, Smith, Byron, Martin, Shines, Needham, and Hillard at all times relevant and material to this complaint.

162.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

163.    Additionally, Defendant City of Chicago was the employer of Defendant Daley at the times so specified in this complaint.  Defendant Daley committed the acts alleged above under color of law and, during his employment with the City, in the scope of his employment as an employee of the City of Chicago.

164.    Defendant Cook County and its State's Attorneys' Office was at all times material to this complaint the employer of Defendants Eannace and Lukanich; additionally it was the employer of Defendant Daley while he was State's Attorney of Cook County.  Cook County is therefore responsible for any judgment entered against Defendants Eannace and Lukanich and for any judgment entered against Defendant Daley for acts committed by him during said employment with the County, making the County a necessary party to this complaint. Defendants Lukanich, Eannace, and Daley committed the acts alleged above under color of law and, when so employed, in the scope of their employment as employees of Cook County and its State's Attorneys' Office.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, Cook County and its State's Attorney's Office, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff demands trial by jury on all counts.

Dated: July 1, 2010

Respectfully submitted,

**RONALD KITCHEN**


By:   /s/ G. Flint Taylor
One of his attorneys

G. Flint Taylor
Joey L. Mogul
Ben H. Elson
Sarah Gelsomino
People's Law Office
1180 N. Milwaukee Avenue
Chicago, Illinois  60622
(773) 235-0070

Locke E. Bowman
Brittany Parling
Roderick MacArthur Justice Center
Northwestern University School of Law
357 E. Chicago Avenue
Chicago, Illinois  60611
 (312) 503-0844

 J. Samuel Tenenbaum
Bluhm Legal Clinic
 Northwestern University School of Law
357 E. Chicago Avenue
Chicago, Illinois  60611
(312) 503-4808

Attorneys for Plaintiff Kitchen