**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RONALD KITCHEN,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    No. 10 C 4093 |
| **JON BURGE, et al.,** | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On August 25, 1988, plaintiff Ronald Kitchen ("Kitchen") was arrested and interrogated in connection with the murders of Rose Marie Rodriguez, Daniel Rodriguez, Deborah Sepulveda, Peter Sepulveda, and Rebecca Sepulveda ("the Rodriguez/Sepulveda murders"). After making an incriminating confession, he was convicted, sentenced to death, and spent twenty-one years in prison. Kitchen claims that he was tortured into confessing by several Chicago Police officers and their supervising Lieutenant, Jon Burge ("Burge"). He further claims that his case is only one of many in which African-American males were tortured by Burge and other officers into confessing to crimes they did not commit. According to Kitchen, this was known to a number of City officials, who conspired with one another to keep the information from reaching the public.

Kitchen's twelve-count complaint alleges several causes of

action against the various participants in this alleged conspiracy. In addition to Burge, Kitchen brings claims against a number of other now-retired members of the Chicago Police Department: John Byrne, Michael Kill, Thomas Byron, and John Smith (the "officer defendants"). Kitchen has also named several City officials, including former police superintendents Leroy Martin and Terry Hillard; Hillard's assistant, Thomas Needham, and Gayle Shines, Director of the Chicago Police Department's Office of Professional Standards ("OPS") (together, the "municipal defendants"). Further, Kitchen has sued former Assistant State's Attorneys Mark Lukanich ("Lukanich") and John Eannace ("Eannace") (together, the "ASA defendants"); and former Cook County State's Attorney and Mayor of Chicago, Richard M. Daley ("Daley"). Finally, Kitchen has sued the City of Chicago ("the City"), Cook County ("the County"), and the Cook County State's Attorney's Office ("SAO").

Each of these groups of defendants has filed a motion to dismiss claims asserted against them in Kitchen's complaint. For the reasons discussed below, Daley's and the ASA defendants' motions to dismiss are granted; the officer defendants' and the municipal defendants' motions to dismiss are granted in part and denied in part.

I.

According to the allegations in Kitchen's complaint, which I must accept as true for purposes of this motion, Kitchen was

initially implicated in the Rodriguez/Sepulveda murders by an associate, Willie Williams ("Williams"). After learning of the crime, Williams, who was incarcerated at the time, contacted Officer Smith and claimed that Kitchen had confessed to committing the murders with an associate named Marvin Reeves ("Reeves"). Smith informed ASA Lukanich of this information, and they subsequently obtained a court order allowing them to listen in on Williams's phone conversations with Kitchen and Reeves. When these failed to produce any incriminating information, police arrested Kitchen on unrelated auto theft charges. He was brought to Area 3 Police Headquarters and handcuffed to the wall of an interrogation room, where he was questioned for sixteen hours. During that time, he was deprived of food and sleep, and was subjected to torture and racial insults by Burge, Byron, and Kill.

Kitchen alleges that Lukanich entered the room on two separate occasions during his interrogation. In each instance, he asked Kitchen whether he was willing to speak with him. Instead of confessing, however, Kitchen asked to speak with a lawyer. Lukanich left the room and the verbal and physical abuse resumed. When Kitchen could no longer endure the torture, he agreed to make a statement. Lukanich returned to the interrogation room, and Kill recited a step-by-step account of the murders. After each step in the narrative, Lukanich asked Kitchen if Kill's account was accurate. Kitchen simply answered with a "yes" after each

question. Lukanich then drafted a statement and Kitchen signed it. In the statement, Kitchen admitted to being present at the scene of the crime, but he denied having committed the murders himself.

Kitchen later filed a pretrial motion to suppress his confession. Kill, Byron, Smith, and Lukanich falsely testified at the hearing that Kitchen had voluntarily confessed and denied that Kitchen had been tortured or coerced.

Lukanich and others had additional meetings with Williams in order to refine his story about Kitchen's alleged confession. Although never disclosed to Kitchen's defense counsel, promises were made to Williams in exchange for his testimony, including money and early release from prison. Additionally, the defendants suppressed exculpatory evidence suggesting that others, including Deborah Sepulveda's husband, had committed the murders. Based solely on his false confession, the officers' perjured testimony, and Williams's fabricated statement, Kitchen was tried, convicted, and sentenced to death.

Kitchen claims that during roughly the same time period, many other African-American males were tortured by Burge and other Area 2 and Area 3 detectives into confessing to crimes they did not commit. He claims that the officers' use of torture was known to a number of public officials who actively worked to cover it up. In particular, Kitchen alleges that Mayor Daley, who served as Cook County State's Attorney from 1981 to 1989, was aware of the torture

from at least as far back as 1982. Also involved in the conspiracy were Leroy Martin, Commander of the Area 2 Detective Division, and who served as Superintendent of Police for the City of Chicago from 1987 to 1992; Gayle Shines, OPS Director from 1990 to 1998; Terry Hillard, Police Superintendent from 1998-2004; and Hillard's chief administrative aid, Thomas Needham.

Among other things, Kitchen's complaint alleges that these defendants worked to suppress a 1990 report prepared by Chicago Police OPS investigator Michael Goldston ("the Goldston Report"), which "found that there was systemic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it." Compl. ¶ 88. The report also found that Burge and Byrne were the "prime movers" behind the abuse. *Id.* When the report was finally released, the defendants sought to publicly discredit it.

Similarly, Kitchen alleges that in 1993, the OPS re-opened investigations into several Area 2 interrogations and concluded that a number of detectives had engaged in torture. Between 1993 and 1998, Shines acted in collusion with the other defendants to suppress the information "by secreting the files that contained those findings in her personal office." Compl. ¶ 100. Moreover, after Hillard became Police Superintendent in 1998, he and Needham worked to overturn the OPS's findings in the reopened cases.

Kitchen later filed a Second Amended Post-Conviction Petition. His conviction was vacated by the Circuit Court of Cook County, and he was granted a new trial. On July 7, 2009, an order of *nolle prosequi* was entered and he was released from custody.

## II.

Rule 12(b)(6) permits a court to dismiss a claim where plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (internal citation omitted). To survive a Rule 12(b)(6) motion, "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting Fed. R. Civ. P. 8(a)(2)). The facts must provide the defendant with "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted). The plaintiff need not plead particularized facts, but the factual allegations in the complaint must be enough to raise a right to relief above the speculative level. *Id.*

**Count I**

Count I of Kitchen's complaint alleges that the defendants violated 42 U.S.C. § 1983 by fabricating inculpatory evidence and

-6-

suppressing exculpatory evidence in connection with his case. The various groups of defendants have raised different objections to Kitchen's claim.

*The Officer Defendants*

The officer defendants do not seek outright dismissal of Count I. Rather, they seek to establish that the claim is not actionable "beyond the ambit of *Brady*." According to the officer defendants, regardless of the way in which the claim is characterized by Kitchen, he is in fact seeking to assert a federal claim for malicious prosecution -- a cause of action that the Seventh Circuit has explicitly and repeatedly declined to recognize. *See, e.g., Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001). Hence, the officer defendants contend that Count I should be construed strictly as a *Brady* claim.

The specific due process claim that Kitchen asserts here has been recognized in many other cases. *See, e.g., Fields v. City of Chicago*, No. 10 C 1168, 2011 WL 1326231, at *4 (N.D. Ill. Apr. 4, 2011); *Howard*, 2004 WL 2397281, at *9; *Patterson v. Burge*, 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004) ("*Patterson I*"); *Corbett v. White*, No. 00 C 4661, 2001 WL 1098054 (N.D. Ill. Sept. 17, 2001). Although defendants in the latter cases, like the defendants here, have often insisted that the claim is a way of asserting a federal malicious prosecution claim by other means, courts have consistently rejected this argument. The difference, as Judge

Andersen has put it, is that "[m]alicious prosecution claims require allegations that the Defendants commenced or continued criminal proceedings against the plaintiff without probable cause," whereas the claim here "arise[s] from allegations that Defendants concealed exculpatory evidence from prosecutors, thereby denying him the right to a fair trial." *Howard*, 2004 WL 2397281, at *9. Although Kitchen contends that he should be allowed to bring a malicious prosecution claim under § 1983 and he purports to preserve the claim "pending possible consideration of the issue in the United States Supreme Court," Kitchen Resp. to Officer Defs. at 5 n.5; *see also* Pl.'s Resp. Mun. Defs. at 4 n.1, he disavows any intention of pressing such a claim in earnest here. In short, the defendants' concerns about Count I's scope are misplaced.

The officer defendants further argue that Count I -- and indeed all counts of the complaint -- should be dismissed as to defendant Byrne. I agree. Bryne is not alleged to have directly participated in Kitchen's torture. Rather, the complaint simply alleges that Byrne was Burge's "right hand man," and that, like Burge, Bryne "engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including the Police Officer Defendants named herein." Compl. ¶ 8. These generic and conclusory allegations are not sufficient to assert a claim against Byrne. Accordingly, I grant the officer

defendants' motion to dismiss Byrne from the complaint.

*The Municipal Defendants*

The municipal defendants assert several arguments for Count I's dismissal. First, they argue that Kitchen's claim fails because it rests on an unsound doctrinal underpinning. In particular, they maintain that Count I is based on a Fourth Amendment theory of "continued imprisonment," which, like the § 1983 malicious prosecution claim, has been expressly rejected by the Seventh Circuit. *See, e.g.*, *Wiley v. City of Chicago*, 361 F.3d 994, 998 (7th Cir. 2004) (noting that the Seventh Circuit has "repeatedly rejected the 'continuing seizure' approach" and stating that the "scope of a Fourth Amendment claim is limited up until the point of arraignment"). Second, the municipal defendants argue that Kitchen seeks to hold them liable for failing to investigate the allegations of torture surrounding Areas 2 and 3. They contend that the claim fails because the Seventh Circuit has held that law enforcement officers have no duty to investigate potentially exculpatory information once they have probable cause to arrest a suspect. *See, e.g.*, *Garcia v. City of Chicago, Ill.*, 24 F.3d 966, 970 (7th Cir. 1994) ("[O]nce police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.")(quotation marks omitted). Further, the municipal

defendants contend that Kitchen's claims against them fail because he does not allege that they had any direct involvement in his torture and other violations of his rights. Indeed, Shines, Hillard, and Needham point out that they had not even obtained their relevant positions as municipal officers at the time of the alleged torture.

These objections misapprehend the nature of Kitchen's claim. As Kitchen explains, for example, Count I does not allege a continuing violation of his Fourth Amendment rights by suppressing exculpatory evidence; he asserts that their actions constituted a continuing violation of his due process right to a fair trial. Similarly, Kitchen does not claim that the municipal defendants are liable for failing to search for evidence that might have proved his innocence; he claims that the defendants worked actively to suppress evidence indicating his innocence. Nor is Kitchen's claim undermined by the fact that certain of the municipal defendants had not yet been hired or appointed to their respective positions at the time he alleges that he was tortured, for Count I seeks to hold them liable for suppressing evidence of his innocence after they had assumed the positions in which they are sued.

The municipal defendants' other main argument is that no causal connection can be established between their alleged conduct and Kitchen's injuries. As they point out, Kitchen's theory is that if the municipal defendants had not suppressed information

about Burge's and other officers' practices of coercing and torturing suspects into making false confessions, Kitchen himself would never have been forced to confess and he would never have been convicted. The municipal defendants claim that the "chain of inferences necessary to conclude plaintiff would have been exonerated sooner if Hillard, Needham, and Shines would have investigated and/or disclosed the re-opened OPS investigations unrelated to plaintiff is too tenuous." Municipal Defendants' Mem. at 9.

This argument has frequently been advanced in other cases arising out of the of coercive interrogation methods as Areas 2 and 3. *See, e.g.*, *Cannon*, 2006 WL 273544, at *12; *Orange v. Burge*, No. 04 C 0168, 2005 WL 742641, at *13 (N.D. Ill. March 30, 2005) ("*Orange I*"); *Patterson I*, 328 F. Supp. at 888, 890; *Howard*, 2004 WL 2397281, at *13. Courts have consistently rejected the argument on the ground that it raises factual questions that cannot be decided on a motion to dismiss. The reasoning of these cases is persuasive. At the present stage, the municipal defendants are entitled to dismissal of Count I only if the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). I cannot say as a matter of law that no causal relationship can be demonstrated between the municipal defendants' conduct and Kitchen's coerced confession.

It is true that, despite their initial determinations to the contrary, the courts in *Orange* and *Patterson* later held that the inferential chain was indeed too weak to support plaintiffs' claims. *See Orange v. Burge*, No. 04 C 0168, 2008 WL 4425427, at *5 (N.D. Ill. Sept. 29, 2008) ("*Orange II*"); *Patterson v. Burge*, No. 03 C 4433, 2010 WL 3894433, at *3 (N.D. Ill. Sept. 27, 2010) ("*Patterson II*"). Importantly, however, the later determinations were made in the context of summary judgment motions -- not, as here, on a motion to dismiss.[1]

In sum, given the facts and procedural posture of this case, I am not persuaded by any of the municipal defendants' arguments for Count I's dismissal. Accordingly, their motion to dismiss is denied as to Count I.

---

[1] In rejoinder, the municipal defendants point out that, although *Orange II* involved a motion for summary judgment, the court nevertheless opined that it would have reached the same conclusion even assuming (as is required under Rule 12(b)(6)) that the plaintiff's allegations were true. *Orange II*, 2008 WL 4425427, at *5. *Orange II*'s holding still does not apply here, however, because of a key factual difference between the two cases. The plaintiff in *Orange II* sought to hold former Cook County State's Attorney Richard Devine liable for failing to disclose evidence of the pattern of torture at Area 2. In the portion of the opinion in question, however, *Orange II* was addressing only the period between 1981 and 1983, which was before the plaintiff had even been arrested. The court unsurprisingly held that Devine could not have suppressed information favorable to Orange before Orange had even been prosecuted. Notably, when the court went on to discuss the plaintiff's claims relating to the period when Devine had returned to the SAO -- after which point Orange had been prosecuted --- the *Orange II* court did not refer back to its earlier conclusion regarding the plaintiff's inability to establish a causal link. Although the court granted Devine summary judgment, it did so on other grounds.

*The ASA Defendants*

ASA defendants Lukanich and Eannace argue that Count I -- as well as the other claims against them -- should be dismissed because, as prosecutors, they are entitled to absolute immunity. It is well-settled that "[p]rosecutors are absolutely immune from suits for monetary damages under § 1983 for conduct that is intimately associated with the judicial phase of the criminal process." *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quotation marks omitted). In other words, "[a] prosecutor is shielded by absolute immunity when he acts as an advocate for the State but not when his acts are investigative and unrelated to the preparation and initiation of judicial proceedings." *Id.* (quotation marks omitted). Whether Lukanich and Eannace are absolutely immune from suit, therefore, depends on whether their conduct can be characterized as "prosecutorial" or must be viewed as "investigatory." And since Lukanich and Eannace played different roles in different phases of Kitchen's case, it is necessary to ask at each point whether they were acting as prosecutors or as investigators.

The complaint first seeks to hold Lukanich liable for his participation in Kitchen's interrogation and confession. Kitchen insists that in coming to Area 3 during the interrogation, and in taking Kitchen's statement, Lukanich was acting as an investigator, not a prosecutor. Courts addressing similar claims in other cases

have consistently found that conduct of the kind alleged of Lukanich falls on the prosecutorial rather than the investigative side of the line. As Judge Zagel remarked in *Andrews v. Burge*, 660 F. Supp. 2d 868 (N.D. Ill. 2009):

> Taking a court reported statement from a defendant is an act within a prosecutor's (as well as a police officer's) duties . . . . The prosecutor acts within his core functions when he evaluates the evidence gathered by police and, in the case of a confession, takes steps to see that the words of the defendant are properly preserved. A prosecutor should not be deprived of immunity because, in a case of murder, he decides to hear what the defendant has to say for himself.

*Id.* at 878; *see also Patterson II*, 2010 WL 3894438, at *10; *Boyd v. Village of Wheeling*, No. 83 C 4768, 1985 WL 2564, at *10 (N.D. Ill. Sept. 12, 1985).

Kitchen's reliance on *Hill v. Coppleson*, 627 F.3d 601 (7th Cir. 2010), is misplaced. There, the prosecutor was alleged to have gone beyond merely taking the plaintiff's statement. For example, the prosecutor was alleged to have "fed" the plaintiff several details about the murder to which he eventually confessed. *Id.* at 603. The prosecutor also whispered and mouthed answers to plaintiff when he was being asked key details about the crime. *Id.* at 604; *see also Orange II*, 2008 WL 4443280, at *10 (no prosecutorial immunity where ASA was "personally involved in [plaintiff's] ongoing interrogation," was present during electric shocking of plaintiff and was part of "ongoing attempts to get 'the story' straight"). Here, by contrast, Lukanich is alleged only to

have taken Kitchen's statement.

Kitchen next argues that Lukanich and Eannace are liable for suppressing exculpatory information after his trial. For example, he maintains that the ASAs failed to respond truthfully to questions by the prosecutors handling Kitchen's post-conviction proceedings about the manner in which Kitchen's confession had been obtained. Kitchen argues that since at that time Lukanich and Eannace were no longer acting as prosecutors in connection with his case, they are not entitled to prosecutorial immunity for suppressing any exculpatory information.

Kitchen bases his argument on *Houston v. Partee,* 978 F.2d 362 (7th Cir. 1992). In *Partee*, the plaintiffs were convicted of murder. While their appeals were pending, a cooperating witness identified three others as the murderers. The three eventually confessed to the crime. Although the prosecutors were aware of this development, they lied when the plaintiffs' attorney specifically asked for information that had been obtained from the cooperating witness. The prosecutors also testified untruthfully to this effect during appellate proceedings. When the plaintiffs later brought a § 1983 suit, the prosecutors claimed that they were entitled to absolute immunity. The court disagreed, holding that at the time the prosecutors discovered the evidence exculpating the plaintiffs, they were no longer functioning as prosecutors. The court observed that the plaintiff had already been convicted and

that the appeal had been assigned to other prosecutors. As a result, the court held, the "prosecutors' knowledge of and failure to disclose [the] original statements and the three subsequent confessions thus had no connection to their role as advocate for the State." *Id.* (quotation marks omitted).

As with *Hill*, Kitchen's reliance on *Partee* is misplaced. For one thing, the prosecutors in *Partee* suppressed information they had obtained after their role as prosecutors had ceased; here, the exculpatory information in question was obtained by the ASAs while they were still performing their role as prosecutors. Prosecutors remain immune from having to divulge exculpatory information they obtained while prosecutors, even after they are no longer prosecutors. *See, e.g.*, *Reid v. State of N.H.*, 56 F.3d 332, 338 (1st Cir. 1995) (holding that "absolute immunity [was not] forfeited because the prosecutors continued to withhold the exculpatory evidence long after [the defendant's] conviction"); *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986); *cf. Patterson II*, 2010 WL 3894433, at *5 (finding that former State's Attorney Richard Devine was entitled to absolute immunity from liability for failing to disclose exculpatory evidence of a pattern of police brutality).

The ASAs' position is further supported by the Supreme Court's decision in *Van de Kamp v. Goldstein*, 129 S. Ct. 855 (2009). The plaintiff in *Van de Kamp* was released from prison after showing

that prosecutors had failed to turn over potential impeachment information about one of its witnesses. The plaintiff later brought a § 1983 suit against the former Los Angeles County district attorney and chief deputy district attorney for failing properly to train and supervise prosecutors, and for failing to establish an information system containing potential impeachment material about informants. The defendants claimed that they were protected by prosecutorial immunity. The Court agreed.

In reaching its decision, the Court observed that if the plaintiff had sued the trial prosecutor for failing to turn over exculpatory material instead of suing the prosecutor's supervisors for failure to train, the prosecutor's supervisors and his colleagues would all have been protected by prosecutorial immunity. As the Court explained, "*Imbler* makes clear that all these prosecutors would enjoy absolute immunity from such a suit. The prosecutors' behavior, taken individually or separately, would involve "[p]reparation ... for ... trial," and would be "intimately associated with the judicial phase of the criminal process" because it concerned the evidence presented at trial." *Id*. at 862 (citations omitted). From this, the Court reasoned that there was no reason why the prosecutor's supervisors should not be entitled to immunity on the facts of the case before it. The Court explained:

> The only difference we can find between *Imbler* and our
> hypothetical case lies in the fact that, in our

hypothetical case, a prosecutorial supervisor or
colleague might himself be liable for damages instead of
the trial prosecutor. But we cannot find that difference
(in the pattern of liability among prosecutors within a
single office) to be critical. Decisions about indictment
or trial prosecution will often involve more than one
prosecutor within an office. We do not see how such
differences in the pattern of liability among a group of
prosecutors in a single office could alleviate *Imbler*'s
basic fear, namely, that the threat of damages liability
would affect the way in which prosecutors carried out
their basic court-related tasks. Moreover, this Court has
pointed out that it is the interest in protecting the
proper functioning of the office, rather than the
interest in protecting its occupant, that is of primary
importance.

*Id*. at 862-63 (citations and quotation marks omitted).

Under *Van de Kamp* Lukanich and Eannace are entitled to
prosecutorial immunity for their alleged post-trial suppression of
exculpatory evidence. Although Lukanich and Eannace were no longer
prosecutors on the case, they were colleagues of the prosecutors
who had been assigned to work on the appellate phase of Kitchen's
case. As *Van de Kamp's* hypothetical illustrates, immunity extends
to a prosecutor's colleagues and supervisors, without regard to
"the pattern of liability among prosecutors within a single
office." *Id*. at 862.

Lastly, Kitchen argues that the ASAs are liable for the their
alleged role in fabricating the statement of Willie Williams, the
individual who originally brought Kitchen to the attention of the
police. According to Kitchen, "[k]nowing that they did not have
sufficient credible proof to sustain their case, the police officer

Defendants, together with Defendants Lukanich and Eannace . . .
continued their 'investigation' by further shaping Williams' story,
by making promises and extending favors that included giving his
girlfriend rent money and obtaining his early release from prison."
Compl. ¶ 50.   Although Williams's story was "obviously false,"
Compl. ¶ 27, the defendants continued to reward him with such
favors so long as his story was helpful to them in building a case
against Kitchen.

Kitchen contends that the ASAs are not entitled to absolute
immunity for their conduct during this period because they were
engaged in investigatory, rather than prosecutorial, activities.
He also points out that their alleged fabrication of Williams's
statement took place early on in the "investigation" -- about two
weeks prior to Kitchen's arrest and interrogation, *see* Compl. ¶ 31
-- before they could have had probable cause to arrest Kitchen for
the murders.   As Kitchen points out, "A prosecutor neither is, nor
should consider himself to be, an advocate before he has probable
cause to have anyone arrested."   *Buckley v. Fitzsimmons*, 509 U.S.
259, 274 (1993) ("*Buckley II*"); *see also Hill v. Coppleson*, 627
F.3d 601, 605 (7th Cir. 2010).

One issue that Kitchen does not sufficiently address, however,
is that insofar as the ASAs were engaged in preparing Williams to
testify, they retain their prosecutorial immunity.   As the Supreme
Court has repeatedly affirmed, an out-of-court effort to control

the presentation witness' testimony was entitled to absolute immunity because it was fairly within the prosecutor's function as an advocate." *Buckley II*, 509 U.S. at 273 (quotation marks and brackets omitted); *see also Imbler v. Pachtman*, 424 U.S. 409, 431 n.32 (1976).

Even if Lukanich and Eannace were not entitled to absolute immunity for their conduct during this period, they would be entitled to qualified immunity. The qualified immunity inquiry asks two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Kitchen fails to explain in what way the ASAs' conduct violated his constitutional rights. Merely making promises of favorable treatment to Williams does not violate the Constitution. And to the extent that Williams's fabricated story could have resulted in a constitutional violation of Kitchen's rights, the violation could have taken place only when the story was used against Kitchen at trial. *Buckley v. Fitzsimmons*, 20 F.3d 789, 795-96 (7th Cir. 1994) ("*Buckley III*"). At that point, however, they were protected by prosecutorial immunity. *Id.* at 794.

The upshot of the foregoing discussion is that Lukanich and Eannace are entitled to immunity with respect to Count I. As just explained, Lukanich and Eannace committed no violation of Kitchen's

rights by virtue of their alleged fabrication Williams's statement. Insofar as the rest of the ASAs' involvement is concerned, they were acting as prosecutors and are therefore absolutely immune from suit. As a result, Kitchen's claims against the ASAs fail and their motion to dismiss Count I is granted.

*Mayor Daley*

Count I is alleged against Daley in his role as mayor of Chicago (1989 to the present).  As with the ASAs, Kitchen contends that Daley violated his due process right to a fair trial by suppressing and concealing exculpatory information.  In particular, Kitchen cites four different bases for holding Daley liable after he became mayor: (1) Daley's remarks discrediting the OPS Report, which had found that Burge and his subordinates had systematically abused African American suspects in their custody";(2) his promotion of Burge's "confederate," Peter Dignan ("Dignan"), to Lieutenant, despite an OPS finding that Dignan was guilty of torturing several still-incarcerated individuals; (3) his directive to City lawyers, over the objection of his senior staff, to continue defending Burge, even after Burge's indictment by federal authorities for crimes arising out of the torture; and (4) his continued concealment of the information regarding torture by Burge and others, which he had personally learned of during his years as State's Attorney.  *See* Pl.'s Resp. at 19.

For reasons already discussed in connection with the ASAs'

motion, it is clear that the last of these bases (4) does not afford grounds for holding Daley liable. Since Daley was acting as a prosecutor at the time he obtained the information in question, he is immune from having to disclose the information. *Reid*, 56 F.3d at 338; *Shankland*, 800 F.2d at 80. It is true that Daley would not be immune for suppressing exculpatory information he learned after leaving the State's Attorney's Office. But Kitchen does not base his argument on such information. Rather, (4) specifically refers to "information regarding torture by Burge and others, which he had personally learned of during his years as State's Attorney."

Kitchen's first three bases also fail to support a claim against Daley. This is because no causal connection can be established between these allegations and the alleged violation of Kitchen's due process rights. It cannot plausibly be argued that Kitchen would have been exonerated if Daley had not promoted Dignan, or if he had not ordered Burge's defense, or if he had not criticized the OPS Report. Indeed, it is difficult to discern any connection between Daley's decisions to promote Dignan or to defend Burge and Kitchen's continued imprisonment.[2]

---

[2] Kitchen's theory becomes slightly more complicated, for he seeks to hold Daley liable not only for Daley's own actions, but also for the acts of the municipal defendants, with whom he claims Daley entered into a conspiracy. In particular, Kitchen seeks to establish that, as a participant in the conspiracy, Daley is liable not only for the actions he took as mayor but also for deeds of co-conspirators before he joined the conspiracy. Kitchen cites cases for the proposition that "[e]ach conspirator is liable for overt acts of every other conspirator done in furtherance of the

Kitchen insists that this is a factual question that cannot be decided on a motion to dismiss. I disagree. The Supreme Court has affirmed that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.* But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id.*

The fact that I rejected a similar argument in the municipal defendants' case is not inconsistent with my acceptance of the argument in Daley's case. Given the nature of the information that the municipal defendants are alleged to have suppressed, the possibility of establishing a causal link with Kitchen's incarceration is at least minimally plausible. For example, Martin is alleged to have hindered OPS investigations into Burge's and

---

conspiracy, whether the acts occurred before or after he joined the conspiracy." *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981). In making this argument, however, Kitchen attempts to sidestep the fact that Daley possesses absolute immunity for the period in question, and the Seventh Circuit has expressly held that "prosecutors do not lose their absolute immunity by allegations that they conspired to perform actions that are shielded by immunity." *Johnson v. City of Joliet*, No. 1:04CV06426, 2006 WL 1793574, at *5 (N.D. Ill. June 27, 2006); *see French v. Corrigan*, 432 F.2d 1211 (7th Cir. 1970).

others' use of torture at Area 2 and 3 Headquarters; and when findings of torture were made, Shines attempted to "secret" or suppress them. Although none of the suppressed information had specifically to do with Kitchen's case, it is not unreasonable to infer that awareness of other instances of torture could have drawn attention to the problem more generally, causing Kitchen's case to come to light sooner. In Daley's case, however, judicial experience and common sense do not permit such a reasonable inference based on Daley's decision to promote Dignan, for example, or to provide Burge's legal defense. For these reasons, Daley's motion to dismiss Count I is granted.

In sum, the officer defendants' and the municipal defendants' motions to dismiss Count I are denied; the ASAs' and Daley's motions are granted.

**Counts II & III**

In Count II, Kitchen asserts a claim for false arrest/false imprisonment under § 1983; and in Count III, he asserts a § 1983 claim for torture and physical abuse. Both claims allege a violation of Kitchen's Fourth Amendment rights. The defendants argue that since the "scope of a Fourth Amendment claim is limited up until the point of arraignment," *Wiley*, 361 F.3d at 998, both claims are time-barred. Kitchen does not oppose dismissal of either claim. Accordingly, Counts II and III are dismissed.

**Count IV**

Kitchen characterizes Count IV of his complaint as a § 1983 coercive interrogation claim. Specifically, the complaint alleges that the defendants violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment substantive due process right "not to have been convicted based upon a physically coercive interrogation that was shocking to the conscience." Resp. to Def Officers' Mot. to Dismiss at 6.

The defendants first argue that the claim is barred by its two-year limitations period. *See, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 387 (2007). The timeliness of the claim depends on when it accrued. According to the defendants, the claim could have accrued no later than 1990 (i.e., when Kitchen challenged his interrogation during a suppression hearing). However, Kitchen maintains that the claim did not accrue until his conviction was set aside.

To determine when the claim accrued, it is necessary to consider *Heck v. Humphrey*, 512 U.S. 477 (1994). "Under the *Heck* framework, a claim that directly attacks the validity of a conviction cannot accrue until after the conviction has been terminated in a manner favorable to the plaintiff." *Parish v. City of Elkhart*, 614 F.3d 677, 681 (7th Cir. 2010). The question is whether Kitchen's claim directly attacks the validity of his conviction. If so, the claim will not have accrued until after his conviction was set aside.

I agree with the other courts to have considered the issue that

Kitchen's coercive interrogation claim cannot be challenged without impugning the validity of his conviction. *See, e.g.*, *Walden v. City of Chicago*, No. 04 C 0047, 2010 WL 5168789, at *11 (N.D. Ill. Dec. 21, 2010) (plaintiff's claim did not accrue until he received the innocence pardon because he could not have challenged his coerced interrogation without necessarily demonstrating the invalidity of his conviction under *Heck*); *see also Cannon*, 2006 WL 273544, at *9.

From this, it follows that Kitchen's claim in Count IV did not accrue until August 19, 2009, the date on which Kitchen he received his certificate of innocence. Since his suit was filed within two years of that date, Count IV is timely.

*Municipal Defendants*

Of the municipal defendants, Count IV is alleged only against Martin. Kitchen alleges what he refers to as a "supervisory liability/failure to intervene" claim. *See* Pl.'s Resp. to Municipal Defs. at 4. The parties dispute at length whether "supervisory liability" is allowed under § 1983. On inspection, however, the dispute is merely verbal. The Seventh Circuit has recognized liability for faulty supervision. *See, e.g., Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010); *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005) ("Under § 1983 . . . supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent."); *Jones v. City of Chicago*, 856 F.2d 985,

992-93 (7th Cir. 1988) ("There is no principle of superiors'
liability, either in tort law generally or in the law of
constitutional torts. To be held liable for conduct of their
subordinates, supervisors must have been personally involved in that
conduct . . . . The supervisors must know about the conduct and
facilitate it, approve it, condone it, or turn a blind eye for fear
of what they might see. They must in other words act either
knowingly or with deliberate, reckless indifference. This heavy
burden on plaintiffs is easy to understand in a case such as this
case where the ground of the supervisors' liability is that they
conspired with subordinates to violate the plaintiff's
constitutional rights.") (citations omitted).

Here, Kitchen is not seeking to hold Martin vicariously liable
for others' actions; he claims that Martin is primarily liable for
failing to stop others from violating his constitutional rights.
*See* Compl. ¶¶ 127, 128. His liability, if any, is not for the
officers' actions but for his own action in failing to stop them.
Accordingly, the municipal defendants' motion to dismiss Count IV
is denied.

*The ASA Defendants and Mayor Daley*

Lukanich (the only ASA defendant against whom Count IV is
asserted) and Daley are both immune with respect to Count IV for the
same reasons as discussed in connection with Count I.

In addition to the federal claims asserted in Counts I and IV,

the ASA defendants claim that they are immune with respect to Kitchen's state law claims. The ASAs base their argument on two distinct grounds: prosecutorial immunity and sovereign immunity. Kitchen contends that prosecutors are immune from suit under Illinois law only insofar as they have not acted with malice. Since he has alleged that the defendants did act with malice, Kitchen maintains that the ASAs are not entitled to prosecutorial immunity for his state law claims.

Kitchen's account of prosecutorial immunity under Illinois law is mistaken. In particular, as the ASA defendants point out, Kitchen confuses prosecutorial immunity under Illinois law with "public official immunity." *See, e.g.*, *Lanza v. City Of Chicago*, No. 08 C 5103, 2009 WL 3229407, at *4 (N.D. Ill. Oct. 1, 2009); *Hughes v. Krause*, No. 06 C 5792, 2008 WL 2788722, at *1 (N.D. Ill. July 17, 2008). "Although under Illinois law there is a doctrine of public official immunity which has a lack of malice requirement [in order for the immunity to apply], such is not the immunity afforded prosecutors." *Lanza*, 2009 WL 3229407, at *4 (quotation marks). "Rather . . . prosecutors, like judges, must be allowed to perform the functions of their jobs fearlessly and without fear of consequence." *Id.* Relying on the Supreme Court's jurisprudence, the Illinois Appellate Court held that a "prosecutor is absolutely immune only for those activities 'intimately associated with the judicial phase of the criminal process.'" *White v. City of Chicago*,

861 N.E.2d 1083, 1088 (Ill. App. Ct. 2006)(quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see also Patterson II*, 2010 WL 3894438, at *11; *Gordon*, 2008 WL 4594354, at *17. Decisions appearing to hold the contrary have either been changed on reconsideration, *see, e.g., Hughes v. Krause*, No. 06 C 5792, 2008 WL 904898, at *6 (N.D. Ill. Mar. 31, 2008), altered on reconsideration by *Hughes v. Krause*, No. 06 C 5792, 2008 WL 2788722, at *1 (N.D. Ill. July 17, 2008), or have been misunderstood, *Horstman v. County of DuPage*, 284 F. Supp. 2d 1125, 1132 (N.D. Ill. 2003).[3]

Since the Illinois and federal doctrines of prosecutorial immunity are coterminous, and since I have determined that the ASA defendants are entitled to prosecutorial immunity under federal law, it follows that they are also entitled to immunity with respect to Kitchen's state law claims. It is also unnecessary for me to consider whether the ASAs are protected by sovereign immunity.[4]

---

[3] *Gordon* cited my decision in *Horstman* as refusing to dismiss a claim based on prosecutorial immunity because the plaintiff had alleged malice on the defendant's part. *Gordon*, 2008 WL 4594354, at *16. In point of fact, *Hortsman* discussed malice only in connection with public official immunity. *Horstman*, 284 F. Supp. 2d at 1132-33. I declined to dismiss on prosecutorial immunity grounds because of factual questions as to whether the defendant had been acting as an investigator or a prosecutor. *Id.* at 1132.

[4] It is also unnecessary for me to entertain the ASAs' contention that I lack jurisdiction over Kitchen's state law claims because of 705 ILCS 505/8, which provides that the Illinois Court of Claims "shall have exclusive jurisdiction to hear and determine . . . [a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private

The parties devote virtually no attention to whether Daley can be liable for the state law claims brought against him. Both parties appear to assume that the same analysis would apply to the state as well as federal claims. Since the federal claims against Daley have been dismissed, the state claims are dismissed against him as well.

**Counts V and X**

In Count V, plaintiff alleges three conspiracy claims: (1) a claim under § 1983 for conspiracy to violate plaintiff's constitutional rights; (2) a claim under § 1985 for conspiracy to deprive plaintiff and other African Americans of the equal protection of the laws and/or of equal privileges and immunities under the law; and (3) a claim under § 1986 for failure to prevent the § 1985 conspiracy. The claim is asserted against all of the defendants, but since the claims against the ASAs and Daley have been dismissed, it is necessary to consider Counts V and X only insofar as they apply to the remaining defendants.

"42 U.S.C. § 1983 creates a federal cause of action for the deprivation under color of state law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Fitzpatrick v. City of Hobart*, No. 2:03-CV-359 PS, 2006 WL 2736127, at *6 (N.D. Ind. Sept. 25, 2006) (quotation

----

person or corporation in a civil suit." 705 ILCS 505/8(d).

marks and brackets omitted). "Thus, the Plaintiffs must show that the defendants both 1) deprived them of a right secured by the Constitution or the laws of the United States; and 2) that the defendants acted under color of state law." *Id*.

As for claims under § 1985(3), "four elements are required: (1) a conspiracy; (2) a purpose of depriving any person of equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) injury to one's person or property or a deprivation of a right or privilege of a citizen of the United States." *Malone v. American Friends Service Committee*, 213 Fed. App'x. 490, 494-95 (7th Cir. 2007). Section 1986 "creates a cause of action against a person that neglects or refuses to stop a conspiracy to violate the civil rights of a member of a protected class." *Id.* at 494.

The defendants first argue that the conspiracy allegations lack sufficient specificity. The Seventh Circuit has made clear that conspiracy claims under § 1983 are not subject to a heightened pleading standard. *See, e.g.*, *Srivastava v. Cottey*, 83 Fed. App'x. 807, 810 (7th Cir. 2003). Rather, a complaint need only provide "notice of time, scope, and parties involved." *Id.* Kitchen's complaint easily satisfies this requirement.

Defendants argue that Kitchen's § 1985 and § 1986 conspiracy claims fail because there must be an underlying predicate violation of constitutional rights. As already explained, Counts I and IV are sufficient to state a claim. Defendants also argue that plaintiff

has failed to allege an "underlying equal protection claim or any specific facts tying Defendant Officers to any racially motivated intent to deprive Plaintiff of his equal protection rights." The complaint alleges that the conspiracy was formed "with the knowledge and purpose of depriving Plaintiff, who is African-American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy." Compl. ¶ 131; *see also* Compl. ¶ 60. Accordingly, I deny the defendants' motions to dismiss Count V.

In addition to his federal conspiracy claims in Count V, Kitchen asserts a state law conspiracy claim in Count X. Defendants do not adduce any further arguments for dismissal of the state law claim. Thus, I decline to dismiss Count X of the complaint.[5]

**Count VII**

Count VII of Kitchen's complaint alleges a claim for false arrest/false imprisonment under Illinois law. The defendants argue

---

[5] In his reply brief, Burge says in passing that Kitchen's conspiracy claim is untimely insofar as it is premised on allegations of torture and coercion. *See* Burge Reply at 7. This contention was raised for the first time in his reply brief and is not developed. As a result, it is forfeited. *See, e.g.*, *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992) (argument was waived "as the plaintiff failed to raise it until his reply brief, leaving the defendants no chance to respond"); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (perfunctory and undeveloped arguments are waived).

that the claim is untimely. The statute of limitations is one year. *Jones v. Navia*, No. 09-cv-6968, 2010 WL 4878869, at *4 (N.D. Ill. Nov. 23, 2010) (citing 745 ILCS 10/8-101).

The Seventh Circuit recently affirmed that under Illinois law, a false arrest ends, and a claim for false arrest therefore accrues, when authorities obtain a warrant for a suspect's arrest. *National Cas. Co. v. McFatridge*, 604 F.3d 335, 344-45 (7th Cir. 2010). Since Kitchen was arrested in 1988, his false arrest claim is time-barred.

Kitchen also claims false imprisonment. His argument depends on the assertion that his false imprisonment claim did not accrue until he was released from prison in 2009. Under Illinois law, "personal injury claims accrue when the plaintiff suffers an injury," or, under the discovery rule, when the "injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Hill v. City of Chicago*, No. 06 C 6772, 2007 WL 1424211, at *5 (N.D. Ill. May 10, 2007) (quotation marks omitted). Based on the allegations in his complaint, Kitchen knew that he had been falsely imprisoned in 1990, when he was first imprisoned. *See, e.g., Thompson*, 2009 WL 674353, at *5; *Jones v. Navia*, No. 09-cv-6968, 2010 WL 4878869, at *4 (N.D. Ill. Nov. 23, 2010); *Cote v. Hopp*, No. 09-1060, 2010 WL 1416851, at *3 (C.D. Ill. April 1, 2010); *Gora v. Edgar*, No. 95 C 4087, 1996 WL 11938, at *2 (N.D. Ill. Jan. 10, 1996); *Burge v. Harvey Police Officers*, No. 97 C 4569, 1997 WL 610045, at *2 (N.D. Ill. Sept. 25, 1997).

Against this, Kitchen argues that his false imprisonment claim did not accrue until he was released from prison.[6]  His position appears to be based on his conception of the claim as a continuing tort or violation.  He claims that his false imprisonment "claim concerns a course of conduct, continuing over many years, beginning with Plaintiff's warrantless arrest without probable cause." Pl.'s Resp. to Officer Defs. at 9.  This view is unpersuasive. As the Illinois Supreme Court has explained, "[a] continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003).  "Thus, where there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury." *Id.* (citations omitted).

Although Kitchen casts his claim as consisting of continuing acts rather than continuing effects, the error is essentially the same.  Courts have indicated that false imprisonment should be viewed as springing from an unlawful act that results in continual ill effects, not from continuing unlawful acts. *See, e.g.,* *Pierce*

_____

[6] Only two cases from this District support this position, *Cooper v. Butler*, No. 92 C 5604, 1995 WL 399009, at *5 (N.D. Ill. June 29, 1995), and *Hernandez v. Sheahan*, No. 93 C 1668, 1993 WL 257486, at *6 (N.D. Ill. July 8, 1993), and their reasoning has been rejected by most courts.  *See, e.g., Thompson v. City of Chicago*, No. 07 C 1130, 2009 WL 674353, at *5 (N.D. Ill. Mar. 12, 2009).

*v. Pawelski*, No. 98 C 3337, 2000 WL 1847778, at *2 (N.D. Ill. Dec. 14, 2000); *see also Jones*, 2010 WL 4878869, at *4; *Ford v. City of Rockford*, No. 88 C 20323, 1990 WL 304240, at *2 (N.D. Ill. May 10, 1990). Kitchen's false imprisonment claim is untimely. Accordingly, Count VII is dismissed.

**Counts VI & XI**

In Count VI, Kitchen asserts a *Monell* claim against the City. "The elements of a *Monell* claim are: (1) the deprivation of a constitutional right; (2) that action was taken pursuant to a custom, policy or practice of the local government unit; and (3) that such action was the cause of the deprivation." *Williams v. Anderson*, No. 09 C 1915, 2010 WL 5014393, at *4 (N.D. Ill. Dec. 2, 2010). The City argues that the *Monell* claim fails because Kitchen cannot establish an underlying violation of his constitutional rights. However, as Counts I and IV sufficiently allege that the officer defendants deprived Kitchen of his civil rights, the City's motion to dismiss Count VI is denied.

The City makes a parallel argument with respect to Kitchen's *respondeat superior* claim in Count XI. The City argues that there can be no vicarious liability absent a showing of primary liability on the part of its employees. As discussed above, Kitchen has alleged state law claims for conspiracy, malicious prosecution, and intentional infliction of emotional distress. These claims form a basis on which the City can potentially be held vicariously liable.

As with Count VI, therefore, the City's motion to dismiss Count XI
is denied.

**Count XII**

Lastly, Count XII asserts a claim for indemnification pursuant
to 745 ILCS 10/9-102 against the City, Cook County, and the County's
State's Attorney's Office.

The City once again argues that it cannot be held vicariously
liable without any showing of primary liability on the part of its
employees.  As already discussed, this argument depends on the
assumption that there can be no showing of primary liability on the
part of the City's employees.  Since that assumption is incorrect,
this argument is without merit and the City's motion to dismiss
Count XII is denied.

The County's motion to dismiss is granted.  In response to the
County's motion, Kitchen explains that he does not seek to hold the
County liable for any substantive defense; instead, he states that
he has named the County as a defendant only because it is a
necessary party in the event that judgments are entered against
Mayor Daley, Lukanich, or Eannace.  Indemnification is unnecessary,
however, because each of these defendants has been dismissed from
the suit.

I also grant the State's Attorney's Office's motion to dismiss.
The State's Attorney's Office is entitled to immunity under the
Eleventh Amendment.  *See, e.g.*, *Hernandez v. Joliet Police Dept.*,

197 F.3d 256, 265 (7th Cir. 1999) (dismissing claim against Will County State's Attorney's Office on the ground that "[t]he Eleventh Amendment prohibits courts from deciding suits brought by private litigants against states or their agencies.") (quotation marks omitted).

III.

For the reasons discussed above, the ASA defendants' motion to dismiss [56] and Mayor Daley's motion to dismiss [45] are granted in their entirety. The officer defendants' motion to dismiss [47] and the municipal defendants' motion to dismiss [44] are granted as to Counts II, III, and IV. Burge's partial motion to dismiss [77] is granted in part and denied in part. All claims are dismissed as to Sergeant Byrne.

**ENTER ORDER:**

Elaine E. Bucklo
United States District Judge

Dated: April 19, 2011